UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 CR 595 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| LORENZO COTTON, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Chicago Police recovered a pistol during a traffic stop of a van Lorenzo Cotton was driving. The Government subsequently charged Cotton with possessing a firearm after being convicted of a crime punishable by more than a year of imprisonment. Cotton now moves the Court to suppress the firearm on the grounds that police unlawfully seized him and searched his vehicle in violation of the Fourth Amendment. Because there was no probable cause or reasonable suspicion to justify the initial stop, the subsequent search was unlawful, and consequently, the Court must suppress the fruit of the search.

# BACKGROUND[1]

On March 2, 2018, Chicago Police Officer Steven Vidljinovic received a tip from a source who stated that that s/he had observed a black man known as "Big Moe" get into a white Ford Windstar van with a handgun. The source reported that the Windstar had temporary plates and that officers could find it in Sherman Park, Chicago, Illinois. Vidljinovic was aware that members of the Black P-Stone Nation gang refer to one another as "moes," and that they refer to the area controlled by the gang, which surrounds Sherman Park, as "Motown." Vidljinovic passed the information on to officers in the vicinity of Sherman Park, and at approximately 12:33 p.m., Officers Pearce and Herrera observed a white Ford Windstar with temporary plates driving near the park.

Officers performed a traffic stop, and upon approaching the van, Pearce asked the driver for his license. The driver stated he did not have it on him but that his license would show up if police ran his name: Lorenzo Montel Cotton. After discussing where Cotton was coming from and where he was headed, Pearce asked Cotton if there was "anything in the car we should know about," which Cotton denied. Doc. 38, Ex. 1, Pearce Body Camera at 1:37. Officers then directed Cotton and his backseat passengers to step out of the car. After searching all three

---

[1] The facts in the background section are taken from the parties' briefs and the body worn camera ("BWC") recordings that the Government submitted to the Court. The Court initially scheduled an evidentiary hearing at Cotton's request to explore issues related to the confidential source. *See United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion."). After the Government disclosed additional materials related to the source, Cotton indicated that a hearing was no longer necessary. The Government, for its part, objects to an evidentiary hearing and submits that the BWC videos provide a sufficient basis on which to decide the motion. Given that neither party asks for an evidentiary hearing, the Court decides the motion solely on the materials submitted to the Court. The Court considers the material facts to be undisputed, and that the Court can resolve the parties' varied characterizations of those facts according to its interpretation of the BWC recordings. *See United States v. Torres*, 191 F.3d 799, 812 (7th Cir. 1999) (no evidentiary hearing required where defendant disputed "characterization of the facts and the conclusions drawn from them").

occupants for weapons, the officers handcuffed them. As Pearce placed one of the rear seat passengers in handcuffs, he stated: "You're just being detained alright, you're not being arrested right now. You're just being detained until we figure out who you are and what's going on, okay?" *Id.* at 2:57. Herrera then began to search the van and after about a minute found a black semi-automatic handgun in the center console.

During the stop, Cotton questioned what gave the officers probable cause to stop him. Pearce responded: "I'll give you probable cause right now. Your tag isn't visible from more than fifteen feet away. Your license plate, it looks like shit, you can't see it. It needs to be free and clear." *Id.* at 9:50. Officers questioned Cotton and the passengers further about the gun before they arrested all three of them.

Subsequent to the criminal charge in this case, the Government disclosed to Cotton that an "anonymous citizen," who did not want to be identified for fear of retaliation, had provided the tip to Vidljinovic. The Government later gave conflicting information as to whether the tip came from an anonymous citizen or a confidential informant. Eventually, the Government made additional disclosure indicating that the confidential source had worked with the Chicago Police Department ("CPD") for approximately one year at the time s/he provided the tip on March 2. S/he had provided information that led to search warrants on at least five different occasions between June 2017 and October 2017. The source also worked with the FBI and had provided information that led to the recovery of firearms on five separate occasions between November 2017 and January 2018. Between November 2017 until the end of October 2018, the FBI paid the source a total of $3850 for the information s/he provided.

**ANALYSIS**

Cotton argues that there was no traffic violation justifying the stop, and therefore the subsequent search that yielded the gun was also unlawful. See *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). He also argues that even if there was a justification for the initial stop the police impermissibly prolonged the encounter based on an unreliable tip in order to search his van.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless traffic stop is justified if police have probable cause to believe that the driver has committed "even a minor traffic offense." *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011). The Fourth Amendment also allows brief investigatory stops of vehicles based on a reasonable suspicion of criminal activity. *Navarette v. California*, 572 U.S. 393, 396–97, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014) (citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d. 621 (1981); *Terry v. Ohio*, 392 U.S. 1, 21–22, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). "Reasonable suspicion amounts to something less than probable cause but more than a hunch." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). The reasonableness of a stop depends on "both the content of the information possessed by police and its degree of reliability." *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)). Looking at the whole picture, the officer initiating the stop "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417–18. The Government bears the burden of demonstrating the justification for a warrantless stop by a preponderance of the

evidence. *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018); *Garcia-Garcia*, 633 F.3d at 612.

Beginning with the lawfulness of the stop, the Government argues the officers had probable cause to stop the van because they "could not read the registration on the rear temporary tag because it was obscured." Doc. 38 at 3. The Government argues this violated § 9-76-050(d) of the Chicago Municipal Code, which states: "The registration plate at the back of every motorcycle and every motor vehicle shall be so lighted that the numbers on said plate shall be plainly legible and intelligible at a distance of 50 feet[.]" Cotton responds that this provision of the code only governs poor lighting, which is irrelevant to a stop in broad daylight. Cotton further argues that the body camera videos of the officers show that his license plate was clearly legible.

To begin, it is unclear to what the Government refers when it states that the registration on the temporary tag was obscured. If the Government means that the plate's registration sticker was not visible, that is because temporary plates do not require annual renewal stickers that are affixed to standard plates. *See United States v. Hernandez*, 341 F. Supp. 2d 1030, 1032–33 (N.D. Ill. 2004) ("In fact, Mr. Hernandez' vehicle displayed a temporary Illinois license plate, and not a registration sticker, which are only applied to regular license plates in years subsequent to their initial issue."). As far as the Court can tell, the plate need only display the date of expiration along the bottom. *Id*.

But if by "tag" the government means that the plate itself was not legible, it was not a violation of § 9-76-050. Section 9-76-050 is titled "Required lighting," and nearly all the subsections refer to lamps, such as headlamps ("All motor vehicles . . . shall exhibit at least two lighted head lamps showing white lights or lights with a yellow or amber tint, during the period

5

of sunset to sunrise, and at any other times when due to insufficient natural light or unfavorable atmospheric conditions (fog, snow or rain)[.]"), rear lights ("Each motor vehicle . . . shall also exhibit at least one lighted lamp which shall be so situated as to throw a red light visible for at least 500 feet in the reverse direction."), or other artificial lighting. *Id.* Further, the ordinance does not state that a lamp must always illuminate the registration plate, only that the plate must be properly "lighted that the numbers on said plate shall be plainly legible and intelligible at a distance of 50 feet." *Id.* In other words, a lamp must illuminate the license plate to render it legible at fifty feet under certain conditions, such as at night or if the weather is overcast. But if there is plenty of natural light to illuminate a license plate, the plate is still "lighted." Here, the stop occurred close to noon, and conditions were clear enough to naturally light the Windstar's license plate. A reasonable officer could not have objectively believed that Cotton violated this ordinance.

If the license plate was not clearly visible because it was obscured, as the Government argues, that is a different question, one that would fall under § 9-76-160(a)(4) ("Every registration plate shall at all times be . . . in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible.").[2] The body worn camera ("BWC") recordings, however, do not support this. The license plate, reading "899 T 106," is legible, and there is nothing that masks or obscures it. There is not enough evidence before the Court to support an objective belief that Cotton violated § 9-76-160(a)(4).

However, if the officers had a reasonable suspicion of criminal activity that is enough to justify the stop. The Government does not argue this position, possibly because the inquiry

---

[2] Illinois law contains language identical to the Chicago Municipal Code. *See* 625 Ill. Comp. Stat. 5/3-413 ("[E]very registration plate or digital registration plate shall at all times be . . . in a place and position to be clearly visible and shall be maintained in a condition to be clearly legible, free from any materials that would obstruct the visibility of the plate.").

6

hinges on the reliability of the confidential source, and at the time that the parties submitted their briefs to the Court, the Government had disclosed very little information about the source. Since then, the Government and Cotton have submitted hundreds of pages for the Court to review, including the FBI's entire file on the source. Thus, the Court considers whether the tip itself was enough to supply a reasonable articulable suspicion of criminal activity.

A tip from a confidential source can provide reasonable suspicion if it "carrie[s] enough indicia of reliability." *Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). "The degree of corroboration required before police may deprive a person of liberty, even briefly, depends on the reliability of the tip's source." *United States v. Lopez*, 907 F.3d 472, 480 (7th Cir. 2018). "In determining whether a tip has furnished 'enough verifiable information to provide reasonable suspicion, courts examine the amount of information given, the degree of reliability, and the amount of police corroboration.'" *United States v. Ganser*, 315 F.3d 839, 843 (7th Cir. 2003) (citation omitted). Tips from known, reliable sources require less corroboration than tips from anonymous or questionable sources. *Compare Adams*, 407 U.S. at 146 (officer had reasonable suspicion to act immediately on unverified tip from "informant [who] was known to [the officer] personally and had provided him with information in the past"), *with Florida v. J.L.*, 529 U.S. 266, 271, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000) (no reasonable suspicion where anonymous tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility"), *and Lopez*, 907 F.3d at 480–85 (no reasonable suspicion based on tip from identified source that police knew nothing about).

Here, the source indicated that s/he had personally observed "Big Moe" with a gun and provided a fairly detailed description of the van as a white Ford Windstar with temporary plates.

7

Officers subsequently found the van near Sherman Park, where the source indicated it would be, all of which lends some credibility to the tip's reliability. *See United States v. Harris*, 585 F.3d 394, 401 (7th Cir. 2009) (courts should consider "the degree of detail provided by the informant"). More importantly, the source had a history of providing credible information to law enforcement. *See United States v. Rucker*, 138 F.3d 697, 700 (7th Cir. 1998) (finding tip reliable because, "[a]lthough apparently not an informant of long standing, [the source] had supplied [the officer] with detailed information in the past that had proven accurate"). According to the CPD and the FBI, the source provided nearly a dozen tips that led to search warrants, arrests, and recovered firearms in the year prior to Cotton's arrest. As the Government points out, the FBI paid the source several thousand dollars because her/his tips were reliable. *See Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 607 (S.D.N.Y. 2013) (noting confidential source was reliable, in part, because officer had "used [the source] more than ten times in the past," and had personally paid the informant with police department money each time).

Cotton argues that the source is unreliable because s/he has a significant criminal history, including six prior drug convictions from 2013 to 2014. But that fact alone does not necessarily detract from the source's reliability. *See Edmond v. United States*, 899 F.3d 446, 456 n.21 (7th Cir. 2018) ("[T]he informant's criminal history and pending criminal charges do not necessarily undercut the reliability of his tip."); *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006) ("[A]n informant's criminality does not in itself establish unreliability."). Cotton does not point to any prior conduct that involves lying or deceit, and persons with significant criminal histories can nonetheless provide credible information. *See United States v. 1948 S. Martin Luther King Dr.*, 270 F.3d 1102, 1113 (7th Cir. 2001) (finding no abuse of discretion where district court noted it "did not expect members of the cloth to testify about the intricacies of [claimant's] drug

dealing and money laundering operation [in civil forfeiture proceeding], and the use of witnesses who are cooperating and have criminal histories is not unusual in this context"); *United States v. Rose*, 12 F.3d 1414, 1425 (7th Cir. 1994) ("[I]n this imperfect world, a litigant must often take the witness as he or she is, imperfections and all. We cannot expect that witnesses will possess the credibility of people of the cloth, such as rabbis, priests, and nuns[.]"). The source's track record provided enough indicia of reliability.

Finally, Cotton argues that a report of a person with a gun does not create a reasonable suspicion of criminal activity since a person may lawfully carry a gun with a permit. Cotton points to *Watson*, which involved an anonymous 911 call regarding boys playing with guns standing next to a gray and green Charger in a nearby parking lot. The responding officer drove to the scene and blocked the Charger before approaching on foot. Soon, three other officers arrived and each blocked one car door, before they pulled the occupants out of the car and found a gun inside. 900 F.3d at 893–94. The Seventh Circuit held that the 911 call did not create a reasonable suspicion of criminal activity in part because "[t]he report at its core was one of firearm possession . . . which is not criminal." *Id.* at 897. The court in *Watson* compared these facts to those in *J.L.*, where the Supreme Court found an anonymous call that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" was not sufficiently reliable to justify a stop and frisk for weapons. *Id.* at 897 (citing *J.L.*, 529 U.S. at 268). The *Watson* court concluded that police were right to respond to the call about people with guns but, similar to *J.L.*, "determining what was happening and immediately seizing people upon arrival are two different things, and the latter was premature." *Id.*

*Watson* ultimately held that the tip was not sufficiently reliable because it described conduct that was lawful *and* because the tip came from an anonymous source that called from a

9

borrowed phone. Here the concerns surrounding a fabricated anonymous tip do not apply because police relied on a known and demonstrably reliable source. *See, e.g.*, *J.L.*, 529 U.S. at 270 ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" (citations omitted)). Yet, it is difficult to determine if this is enough to establish a reasonable suspicion of criminal activity when the tip describes conduct that is "at its core" lawful. *Watson*, 900 F.3d at 897. The fact that the tip concerned "Big Moe," and was in the middle of gang territory run by "moes," might have heightened the officers' suspicion. *See United States v. Richmond*, 924 F.3d 404, 411–12 (7th Cir. 2019) ("[Defendant's] presence in neighborhood beset by drug trafficking and gun violence . . . . is among the relevant contextual considerations in a reasonable suspicion analysis."), *petition for cert. filed*, No. 19-6343 (U.S. Oct. 15, 2019). But *Watson* warned that a report of a gun in a high-crime area did not tip the scales in the government's favor, for "[p]eople who live in rough neighborhoods may want and, in many situations, may carry guns for protection. They should not be subject to more intrusive police practices than are those from wealthy neighborhoods." 900 F.3d at 897; *see also Richmond*, 924 F.3d at 425 (Wood, J., dissenting) ("Mere possession of a firearm in a high-crime area . . . is not good enough."). And "Big Moe" was not necessarily anything more than a nickname.

*Adams* contains facts that are in many ways similar to those in this case. There, a police sergeant was on patrol in a high-crime area at 2:15 a.m. when a person he knew "approached his cruiser and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." 407 U.S. at 145–46. The sergeant went to investigate, tapped on the suspect's car window, and asked the occupant to open the door. "When Williams [the occupant]

10

rolled down the window instead, the sergeant reached into the car and removed a fully loaded revolver from Williams' waistband." *Id.* The Supreme Court found no Fourth Amendment violation because the sergeant "had ample reason to fear for his safety." *Id.* at 148. The Court also highlighted that the sergeant knew the informant, who had provided information to him in the past. Although the confidential source is similarly reliable in the present case, there is one important distinction. In *Adams*, the tip involved a person with a gun and narcotics, which together plausibly indicate criminal activity. *See, e.g.*, *United States v. Vaughn*, 585 F.3d 1024, 1029 (7th Cir. 2009) ("[G]uns are tools of the drug trade[.]"). There was no such information here. Neither was there any information indicating that the person with the gun was a felon, *see United States v. Robinson*, 537 F.3d 798, 801 (7th Cir. 2008) (officers had reasonable suspicion of criminal activity after receiving a tip that defendant was carrying a firearm and officers knew defendant was a felon); *United States v. LePage*, 477 F.3d 485, 488 (7th Cir. 2007) (same), or that the person with the gun was using it in a menacing way, *see United States v. Williams*, 731 F.3d 678, 684 (7th Cir. 2013) (finding 911 call regarding "large group of people being loud and waving guns" in a high-crime area was sufficient for reasonable suspicion, although it was "a very close call"). The facts that distinguish these opinions suggest that the reasoning in *Watson* should apply to this case. Although the source was reliable, the tip did not describe conduct that was necessarily criminal. Therefore, the tip was not enough to create a reasonable suspicion of criminal activity, and consequently the stop was unlawful and the fruit of the subsequent search, including the firearm recovered in the van, is not admissible. *Wong Sun*, 371 U.S. at 488. Because the stop was unlawful, the Court does not address Cotton's second argument that the search of the vehicle was independently unlawful.

## CONCLUSION

For the foregoing reasons, the Court grants Cotton's motion to suppress [28].

Dated: November 18, 2019

SARA L. ELLIS
United States District Judge